**David E. AMSHEY, et al.**

v.

**The UNITED STATES.**

**Nos. 583–86C, 703–86C, 296–87C, 196–88C and 197–88C.**

United States Claims Court.

June 30, 1992.

---

Michael T. Leibig, Washington, D.C., attorney of record for plaintiffs. Marci R. Weiser and Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, P.C., of counsel.

Domenique Kirchner, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, attorney of record for defendant. Andrea Hagen, Office of Chief Counsel, U.S. Secret Service, of counsel.

## OPINION

HARKINS, Senior Judge:

In these consolidated cases, plaintiffs are 465 employees of the Treasury Department in the Uniformed Division (UD) of the United States Secret Service. Proceedings have been exceptionally contentious, and, as a result, unnecessarily protracted.

On January 22, 1987, counsel's Joint Preliminary Status Report listed 15 issues generated by the complaints. On counsel's recommendation proceedings were bifurcated, with liability issues to be determined in Stage 1, and damages deferred to Stage 2. Five years later, proceedings still are in Stage 1. One reason for the slow development of these cases may be the concerns of both parties that extend beyond Fair Labor Standards Act (FLSA) coverage of the UD. Defendant's counsel is apprehensive that FLSA nonexemption of UD sergeants and lieutenants threatens Office of Personnel Management's (OPM) regulatory supervision of the federal classified service. Plaintiff's counsel is concerned that FLSA exemption of UD sergeants and lieutenants threatens the status of state and local police personnel.

When the complaints were filed in 1986, the personnel office of the Secret Service considered the sergeant and lieutenant positions in the UD to be exempt from FLSA. At that time, however, because the UD was not subject to the Classification Act, position descriptions for sergeants and lieutenants did not exist, and these positions had not been subject of desk audits.

In 1988, the Secret Service undertook a study of the sergeant and lieutenant positions in the UD to review the validity of the decision that those positions were exempt from the overtime pay provisions of the FLSA. The study was made against the background of the challenge these cases posed to the validity of the exemption decision.

The Secret Service study was performed by Ms. Susan Tracey, then assistant to the Chief of the Secret Service Personnel Division. The report (Tracey report) was communicated to plaintiffs on October 11, 1988. The Tracey report with respect to 48 UD positions concluded that three sergeant positions were nonexempt from FLSA coverage, and that all other sergeant and lieutenant positions were exempt.

On August 11, 1989, a joint stipulation was filed for entry of partial judgment to resolve claims for compensation for time spent by plaintiffs in the Canine Corps in transporting assigned dogs to and from work and caring for the dogs in off-duty hours. Final judgment in the amount of $750,000 in favor of 31 plaintiffs named in the stipulation as a group was entered on August 15, 1989.

From October 2, 1989, to August 28, 1990, Stage 1 proceedings centered on cross-motions for partial summary judgment, and the positions occupied by 43 lieutenants and 125 sergeants in the UD. The

cross-motions concerned two issues: (1) the FLSA exemption issue, and (2) the *Lanehart* issue.[1] The motion papers and argument disclosed infirmities in the Tracey report's descriptions of UD positions and ambiguities in tasks performed.

The motions for partial summary judgment on the exemption issue were denied because genuine issues of material fact were in dispute. On the *Lanehart* issue, defendant established that overtime worked by plaintiffs was not "regularly scheduled." Plaintiff's motion for partial summary judgment on that issue was denied and defendant's cross-motion was allowed.

On the exemption issue, the parties were unable to agree upon a comprehensive stipulation of facts sufficient to describe the work performed in the UD positions. Accordingly, disposition of the exemption issue through summary judgment procedures was not feasible.

Throughout the proceedings on the exemption issue, the parties were separated by a basic difference as to the scope of the FLSA statutory authorizations to the Department of Labor (DOL) and to the Office of Personnel Management (OPM), and to the applicability of DOL regulations to FLSA coverage of the UD positions. The Tracey report, and defendant's efforts to stipulate facts relative to work performed, centered exclusively on criteria and definitions in OPM's regulations for administrative and executive exemptions. As a result the parties were unable to agree on the specific details of tasks performed in the normal course of work in the disputed positions and the amount of time expended in those tasks.

By January 4, 1991, the parties could agree on 40 stipulations. On that date, plaintiff filed a list of 15 additional proposed stipulations that defendant refused to stipulate. On February 4, 1991, the parties added seven more stipulations, and identified 22 areas where counsel were unable to agree.

At a pretrial conference on February 6, 1991, it became clear that the parties were unable to agree upon a description of facts applicable to the disputed positions, or upon the facts that would apply to a list of positions that would put into focus all elements relative to the exemption issue. In this posture, counsel were directed jointly to select and identify the positions that would resolve plaintiffs' claims on the exemption issue to be resolved in Stage 1.

On January 22, 1991, defendant filed a motion for partial summary judgment applicable to eight of the positions described in the Tracey study. It was agreed at the conference that a trial would not be held with respect to the eight positions identified in defendant's motion for partial summary judgment.

On February 20, 1991, the parties identified six lieutenant and six sergeant positions to be the subject of the trial in Stage 1. At trial it became apparent that the list included seven lieutenant positions, and eight sergeant positions.

Trial was held during the period May 13–24, 1991. During trial, the parties, on May 20, 1991, filed 40 additional stipulations. All stipulations were adopted when proof was closed on May 24, 1992.

The positions that were the subject of trial were:

*Lieutenant Positions*

   (1) Control Center Lieutenant
   (2) Lieutenant subordinate to the Special Agent in Charge (SAIC) within the Office of Protective Operations UD
   (3) Foreign Missions Liaison/Intelligence Lieutenant
   (4) Operational Lieutenant in the Foreign Missions Branch
   (5) Operational Lieutenant in the White House Branch
   (6) Countersniper Lieutenant
   (7) Canine Lieutenant

*Sergeant Positions*

   (1) Building Sergeant

---

**1.** *Lanehart v. Horner,* 818 F.2d 1574 (Fed.Cir.   1987).

(2) Control Center Sergeant, White House Branch

(3) Control Center Sergeant, Foreign Missions Branch

(4) Intelligence Liaison Sergeant, Foreign Missions Branch

(5) Operational Sergeant in the Foreign Missions Branch

(6) Operational Sergeant in the White House Branch

(7) Special Operations Sergeant

(8) Worker Access and Visitor Entrance System (WAVES) Sergeant

The ultimate issue of course is whether sergeants and lieutenants in the UD properly are exempt from the overtime provisions of the FLSA. Subordinate controlling issues are: (1) Is the status of UD sergeants and lieutenants in the positions tried relative to FLSA overtime provisions affected by the fact that their classification, wages, and hours, are controlled by Title IV of the D.C.Code? (2) Are OPM's Title 5 exemption regulations in 5 C.F.R. § 551.204 and 5 C.F.R. § 551.205 consistent with DOL's Title 29 exemption regulations in 29 C.F.R. §§ 541.1 and 541.2? In the case of conflict, do DOL's regulations control? (3) Do the UD positions that were the subject of trial meet the criteria in the OPM regulations applicable to executive and administrative exemptions?

I.

The history of the UD begins with the creation of the White House Police force on September 14, 1922,[2] to protect the Executive mansion and its grounds. The White House Police force, consisting of 33 members, was a separate and distinct organization under the President's supervision, with members appointed from the Metropolitan

Police of the District of Columbia and the United States Park Police. In 1930, the White House Police force had grown to 250 officers and was placed under the supervision of the Secret Service.[3] In 1962, responsibilities were expanded to include the protection of the President and members of his immediate family, and any building in which White House offices are located. Supervision of the White House Police force was transferred from the Chief of the Secret Service to the Secretary of the Treasury.[4] In 1970 the White House Police force was renamed the Executive Protective Service (EPS), given increased responsibilities, and the manpower ceiling was increased to 850 officers. The EPS had the additional duty to provide protection for foreign diplomatic missions in the Washington metropolitan area, and in other areas of the United States, its territories and possessions as the President might have directed on a case-by-case basis.[5]

In 1974, EPS duties were expanded to include protection for the Vice President, his family and the Vice President's residence.[6] In 1975, the EPS was enlarged to a manpower ceiling of 1,200 members, and given authority to provide protection under certain conditions in other metropolitan areas of the United States where there are located 20 or more foreign diplomatic missions.[7]

On November 15, 1977, the name of the EPS was changed to United States Secret Service Uniformed Division.[8] In 1986, the U.S. Treasury Police were merged with the UD, and the UD was authorized to protect Treasury buildings and grounds.[9] As of September 20, 1990, the UD had 1,138 members: 961 officers (including technicians), 131 sergeants and 46 lieutenants.

2. Pub.L. No. 67–300, 42 Stat. 841 (Sept. 14, 1922).

3. Pub.L. No. 71–221, 46 Stat. 328 (May 14, 1930).

4. Pub.L. No. 87–481, 76 Stat. 95 (June 8, 1962).

5. Pub.L. No. 91–217, 84 Stat. 74 (Mar. 19, 1970).

6. Pub.L. No. 93–552, § 609(a), 88 Stat. 1764 (Dec. 27, 1974).

7. Pub.L. No. 94–196, 89 Stat. 1109 (Dec. 31, 1975).

8. Pub.L. No. 95–179, 91 Stat. 1371 (Nov. 15, 1977).

9. Pub.L. No. 99–500, Title I, § 101(m), 100 Stat. 1783–333 (Oct. 18, 1986); Pub.L. No. 99–591, 100 Stat. 3341–333 (Oct. 30, 1986).

The original cadre of the White House Police force was authorized in Title 3, The President, of the United States Code. Section 202 reflects the successive amendments that now are applicable to the UD.[10]

Classification of members of the UD is controlled by Title IV of the D.C.Code, which provides a pay schedule ranging from Class 1 (police private) to Class 11 (Chief of Police). Police sergeants are in Class 4, and police lieutenants are in Class 5.[11] The UD uses a rank-in-the-person system. This is a pyramidal structure comparable to military organizations in which captains are superior to lieutenants, lieutenants are superior to sergeants, and sergeants are superior to privates ["officers" in UD]. The UD military style organization appears to be a residue from the post-Civil War period and federal administration of the District of Columbia prior to home rule. The use of military titles does not signify a distinctive status for UD sergeants and lieutenants that is comparable to the officer/enlisted or commissioned/noncommissioned officer status in military organizations. In the UD, however, the rank-in-the-person system recognizes some supervisory responsibility or authority in UD lieutenants and sergeants over lower classed personnel.

Congress sets the rate of pay and the rates of overtime pay for all members of the UD, including sergeants and lieutenants. Sergeants and lieutenants in the UD do not determine the rates of pay or overtime pay for their subordinates. Members of the UD by statutory directive receive a salary at the rate provided for the corresponding grade in the Metropolitan Police force.[12] Members of the UD not appointed from the Metropolitan Police force or the United States Park Police force are entitled to the same privileges as to salary, grade, uniforms, equipment, transfer, leave, relief funds, retirement and refunds as members appointed from the Metropolitan Police force and the United States Park Police force.[13]

The following table sets forth the annual pay ranges for UD sergeants and lieutenants at times relevant to this case.

| | | Sergeants | Lieutenants |
|---|---|---|---|
| Jan. 1990 | 14, | $33,171 to $41,462 | $37,618 to $45,147 |
| Sept. 1990 | 7, | $34,501 to $43,122 | $39,123 to $46,957 |
| Jan. 1991 | 13, | $35,916 to $44,892 | $40,728 to $48,887 |

**10.** 3 U.S.C. § 202 (1988) reads as follows:
There is hereby created and established a permanent police force, to be known as the "United States Secret Service Uniformed Division". Subject to the supervision of the Secretary of the Treasury, the United States Secret Service Uniformed Division shall perform such duties as the Director, United States Secret Service, may prescribe in connection with the protection of the following: (1) the White House in the District of Columbia; (2) any building in which Presidential offices are located; (3) the Treasury Building and grounds; (4) the President and members of his immediate family; (5) foreign diplomatic missions located in the metropolitan area of the District of Columbia; (6) the temporary official residence of the Vice President and grounds in the District of Columbia; (7) the Vice President and members of his immediate family; (8) foreign diplomatic missions located in metropolitan areas (other than the District of Columbia) in the United States where there are located twenty or more such missions headed by full-time officers, except that such protection shall be provided only (A) on the basis of extraordinary protective need, (B) upon request of the affected metropolitan area, and (C) when the extraordinary protective need arises in association with a visit to or occurs at a permanent mission to an international organization of which the United States is a member or an observer mission invited to participate in the work of such organization, provided that such protection may be provided for motorcades and at other places associated with such a visit and may be extended at places of temporary domicile in connection with such a visit; and (9) foreign diplomatic missions located in such areas in the United States, its territories and possessions, as the President, on a case-by-case basis, may direct. The members of such force shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia.

**11.** D.C.Code § 4–406 (1981). The Civil Service classification system does not apply to members of the United States Park Police or to the UD. 5 U.S.C. § 5102(c)(5). The premium pay provisions of Title V do not include employees of the Park Police or the UD. 5 U.S.C. § 5541(2)(iv).

**12.** 3 U.S.C. § 204(b).

**13.** 3 U.S.C. § 206.

Generally, the pay ranges for UD officers and technicians are lower than for sergeants and lieutenants. On January 14, 1990, UD officers were paid in a pay range of $25,337 to $36,471 annually, and technicians were paid in a pay range of $26,147 to $37,281.

Overtime pay applicable to members of the UD is provided in D.C.Code § 4–1104. The overtime authorized in section 4–1104 is known as Title IV overtime. For the UD, the D.C.Code defines "authorizing official" as Secretary of the Treasury.[14] The term "officer or member" is defined as "any employee in the Metropolitan Police force or the Fire Department of the District of Columbia, the United States Park Police force, or the United States Secret Service Uniformed Division whose compensation is fixed and adjusted in accordance with §§ 4–406 to 4–420."[15]

Members of the UD who are not exempt from the FLSA are entitled to overtime pay. Nonexempt UD officers and technicians, for example, are entitled to overtime pay under both Title IV and FLSA, whichever pay authority provides the greater overtime entitlement in the work week.[16] Overtime hours of UD sergeants and lieutenants have not been involved in such comparative calculations because defendant considers them to be exempt.

Pursuant to Title IV, members of the UD are eligible for compensatory time for overtime worked as a result of (1) a first court appearance in a case, or (2) immediate continuation of the member's regular tour of duty.[17] Only overtime worked as a result of immediate continuation of duty ("immediate continuation of duty overtime") is credited in multiples of one hour under Title IV; for example, if a member works 30 minutes or more, he or she is credited one hour.[18] However for all other types of overtime, which make up the great bulk of overtime worked, overtime worked is credited in quarter hour (*i.e.*, 15 minute) increments.

For all types of overtime other than first court appearance or immediate continuation of duty overtime, lieutenants, sergeants, and officers have the choice between receipt of compensatory time or receipt of monetary compensation. The choice between receipt of compensatory time or receipt of monetary compensation is given to benefit UD members. Lieutenants have the choice of receiving compensatory time or monetary compensation at straight time.[19] Officers and sergeants have the option to receive overtime pay in compensatory time or as monetary compensation at time and one half.[20]

When sergeants are given compensatory time for overtime, it is on a 1:1 basis (one hour of compensatory time for each hour of overtime performed). When sergeants work overtime for monetary compensation, it is on a 1.5:1 basis (one and one-half hour's pay for each hour of overtime performed).

Lieutenants are paid overtime under a hourly system. When they are compensated for overtime, they either receive monetary compensation on 1:1 basis, or receive compensatory time on a 1:1 basis (for each extra hour they work, they are paid either one hour's pay, or receive an hour of compensatory time).

In computing overtime for monetary compensation, the time worked is compensated in full quarter hour increments. Any work period of less than a 15 minute increment is dropped.

Defendant's time computations for crediting sergeants and lieutenants with com-

---

**14.** D.C.Code § 4–1104(a)(1).

**15.** D.C.Code § 4–1104(a)(9).

**16.** *See* 5 C.F.R. § 551.513.

**17.** D.C.Code § 4–1104(f)(1).

**18.** D.C.Code §§ 4–1104(f)(2), 4–1104(g).

**19.** D.C.Code §§ 4–1104(d)(1)(B), (d)(2).

**20.** D.C.Code §§ 4–1104(d)(1)(A), (d)(2).

pensatory time are different than its time computations for crediting overtime for monetary compensation. Except for "call back" overtime, compensatory time is credited in increments of 30 minutes. Thirty minutes or more of an hour is credited as one hour. If a member is directed to return to overtime duty at a time which is not an immediate continuation of duty (*i.e.*, call back overtime), UD Manual UND–19 [21] provides the member receive credit for no less than two hours of compensatory time.

Sergeants and lieutenants who request annual leave and who have an existing balance of compensatory time have their compensatory time balance reduced to zero before they are charged annual leave. An exception to this rule is where annual leave must be used or forfeited.

UD Manual UND–20 provides that sergeants and lieutenants who report to work late will be required to supply an explanation by executing an SSF 2067 form for their tardiness to their Watch Commander as soon as they report for duty. "Based upon the facts contained in the explanation and investigation where appropriate, the Watch Commander will decide whether the reasons for the tardiness are acceptable or unacceptable." The Manual further provides:

> If the reasons are *acceptable* and the amount of time tardy is less than one-half hour, the matter will be considered closed. If the amount of time tardy is more than one-half hour, members will be permitted to take compensatory time off, annual leave, or leave without pay, as the status of the member's leave account may permit.

> If the reasons for the tardiness are found to be *unacceptable*, members will be charged AWOL [absence without leave]. AWOL is charged in one-hour increments; therefore, a member will not

receive pay for the time charged AWOL and will not be required to work for that time. An accumulation of charges of AWOL will serve as the basis for disciplinary action.

A sergeant's or lieutenant's pay is subject to reduction only if he or she is in a leave without pay status, or an AWOL status. Sergeants and lieutenants have been docked pay or accrued compensatory time for tardiness under this policy.

## II.

As enacted in 1938, the FLSA applied only to the private sector. The expressed purpose of the FLSA was to eliminate labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers.[22] The mechanism to secure this objective was the establishment of minimum hourly wage rates and maximum hours in a work week. The FLSA required employers to pay one and one-half times the regular rate of pay to employees for any work performed in excess of a work week longer than 40 hours.[23] The FLSA created a Wage and Hour Division in the Department of Labor, to be under the direction of an Administrator, appointed by the President.[24] The FLSA, as enacted, identified several categories of employees exempted from the minimum wage and overtime pay provisions of the Act. The group of exempt personnel included those "employed in a bona fide executive, administrative, professional or local retailing capacity, or in the capacity of outside salesman. (as such terms are defined and delineated by regulations of the Administrator)" [25]

When the FLSA was enacted in 1938, its wage and overtime provisions did not apply to employees of state and local governments.[26] In 1966, Congress extended

---

**21.** United States Secret Service Uniformed Division Manual (UD Manual), Section UND–19, (Dec. 15, 1987).

**22.** Act of June 25, 1938, ch. 676, § 2, 52 Stat. 1060.

**23.** *See* 29 U.S.C. §§ 206 & 207(a) (1988).

**24.** 29 U.S.C. § 204(a).

**25.** Act of June 25, 1938, ch. 676, § 13(a)(1), 52 Stat. 1067.

**26.** Act of June 25, 1938, ch. 676, § 3(d), 52 Stat. 1060.

FLSA coverage to state and local government employees for the first time by withdrawing the minimum wage and overtime exemptions from public hospitals, schools, and mass transit carriers whose rates and services were subject to state regulation.[27] In 1974, Congress brought the States and their subdivisions further within the ambit of the FLSA by extending FLSA coverage to virtually all state and local government employees.[28] The 1974 amendments included employees of the federal government, despite objections from the Civil Service Commission that existing civil service overtime laws were adequate and that FLSA coverage would confuse administration of two separate overtime provisions.[29] The potential conflict was resolved by including federal employees within the coverage, and giving the Civil Service Commission [now OPM] authority to administer the provisions of the FLSA "with respect to any individual employed by the United States."[30]

### III.

Early administration of the FLSA generated substantial controversy as to the scope of the minimum wage and maximum hours concepts. Gradually, the opposition to FLSA corrections for low wages and long hours diminished. DOL regulations and judicial decisions clarified many issues,

employers either supported or acquiesced in compliance to DOL's authority, and the class of employees covered has expanded steadily. The 1974 amendments made the government of the United States, and its agencies, as well as state and local governments, subject to the Act as employers, and gave their employees the Act's benefits, including the right to sue the public agencies for violations.[31] This extension of coverage reflects the general acceptance of the FLSA concepts as administered by the DOL.

Throughout its history, criteria applicable to the Section 13(a) exemption for employees in a "bona fide executive, administrative, or professional capacity" have generated vigorous controversy. This controversy persists, and, with the advent of OPM to administer the FLSA provisions with respect to United States employees, has intensified.[32]

The DOL criteria have been relatively well defined by judicial decision. In 1940, the Eighth Circuit observed that the FLSA is a remedial statute, with a humanitarian end in view. Exemption would tend to defeat its purpose. A statute of this nature, under the rules of construction, should be broadly interpreted as to coverage, and its exemptions should be narrowly

**27.** Fair Labor Standards Amendments of 1966, §§ 102(a) and (b), 80 Stat. 831.

**28.** Fair Labor Standards Amendment of 1974, §§ 6(a)(1) & (6), 88 Stat. 58, 60, 29 U.S.C. §§ 203(d) & (x).

**29.** *See* Fair Labor Standards Amendments of 1974, H.R.Rep. 913, 93d Cong.2d sess. 28 (1974); *reprinted in* 1974 U.S.C.C.A.N. 2811.

**30.** This authorization is included in 29 U.S.C. § 204(f) as follows:
    The Secretary is authorized to enter into an agreement with the Librarian of Congress with respect to individuals employed in the Library of Congress to provide for the carrying out of the Secretary's functions under this chapter with respect to such individuals. Notwithstanding any other provision of this chapter, or any other law, the Director of the Office of Personnel Management is authorized to administer the provisions of this chapter with respect to any individual employed by

the United States (other than an individual employed in the Library of Congress, United States Postal Service, Postal Rate Commission, or the Tennessee Valley Authority.) Nothing in this subsection shall be construed to affect the right of an employee to bring an action for unpaid minimum wages, or unpaid overtime compensation, and liquidated damages under section 216(b) of this title.

**31.** *See* 29 U.S.C. §§ 203(d), 203(e) & 216(b).

**32.** This court has had occasion to comment that overtime issues spawned by the marriage of FLSA and Title 5 within the federal pay system "has not always been a happy union. The spouses were married late in life, come from very different backgrounds, and thus bring rather fixed and conflicting viewpoints to the connubial hearth, as this case attests. A legal separation does not appear in the offing ..." *Abreu v. United States,* 22 Cl.Ct. 230, 232 (1991), *adopted in part & aff'd,* 948 F.2d 1229 (Fed.Cir. 1991).

construed.[33]

The FLSA exemption status is not committed to agency determination; jurisdiction in cases brought to recover lost overtime wages under the FLSA is a de novo proceeding under the Tucker Act, 28 U.S.C. § 1491(a), and the FLSA, 29 U.S.C. § 216(b). The unique nature of the judicial function under the FLSA early was noted by the Supreme Court. Unlike the Interstate Commerce Act, and the National Labor Relations Act, and other legislation, the FLSA puts upon the Court the independent responsibility of applying *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations.[34] In 1960, the Supreme Court held the FLSA exemptions are to be "narrowly construed," and their application limited to these establishments plainly and unmistakenly within their terms and spirit.[35]

The FLSA in effect establishes a presumption for a nonexempt status. The employer clearly has the burden of establishing a claimed exemption.[36] This burden requires the employer to prove each element of a claimed executive or administrative exemption.[37]

With the departure in the 1974 amendments from the general administrative scheme with respect to application of the FLSA to federal employees, Congress' intention was that the Civil Service Commission would enforce the FLSA in a way that would be consistent with DOL's enforcement of the FLSA in the private sector. The Federal Circuit has described the DOL/OPM relationship as follows:

The legislative history of the 1974 Amendments reflects a desire by the Congress that the Office of Personnel Management administer the FLSA for federal employees so as to "assure consistency with the meaning, scope, and application established by the rulings, regulations, interpretations, and opinions of the Secretary of Labor which are applicable in other sectors of the economy."[38]

The Federal Circuit has recognized that OPM has been given the power to interpret the FLSA and to set forth the guidelines and policies of the agency.[39] OPM, in the exercise of its administrative authority, was empowered to engage in the common agency practice of issuing substantive rules. In promulgating its FLSA regulations, however, OPM is obligated to exercise its administrative authority in a manner that is consistent with DOL's implementation of FLSA. When the civil service and FLSA systems conflict, OPM must defer to the FLSA so that any employee entitled to overtime compensation under FLSA receives it under the Civil Service rules.[40]

The Civil Service Commission, in its letter of instructions to agency heads for applying the FLSA exemption provisions, acknowledged the obligation to maintain results consistent with DOL criteria and interpretations.[41] Federal Personnel Manual (FPM) Letter No. 551–7 in paragraph 1 stated:

The attachment to this letter provides detailed guidelines for identifying the executive, administrative and professional employees who are exempt from the minimum wage and overtime provisions of the FLSA. These guidelines have been designed to integrate FLSA exemption determinations with Federal classifica-

**33.** *Fleming v. Hawkeye Pearl Button Co.,* 113 F.2d 52, 56 (8th Cir.1940).

**34.** *A.B. Kirschbaum Co. v. Walling,* 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638 (1942).

**35.** *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

**36.** *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

**37.** *Walling v. General Industries Co.,* 330 U.S. 545, 547–48, 67 S.Ct. 883, 883–84, 91 L.Ed. 1088 (1947).

**38.** *Abreu v. United States,* 948 F.2d at 1231 n. 6.

**39.** *Zumerling v. Devine,* 769 F.2d 745, 750 (Fed. Cir.1985).

**40.** *American Federation of Government Employees v. OPM,* 821 F.2d 761, 770 (D.C.Cir.1987).

**41.** FPM Letter No. 551–7 1 (July 1, 1975).

tion systems to the extent possible, while maintaining results consistent with the basic exemption criteria and interpretations established by the Department of Labor.

The attachment contained a section captioned: General Considerations in Interpreting and Applying FLSA Exemption Criteria. This section included the following:

Numerous judicial precedents have firmly established the principles that:

(1) FLSA exemptions must be narrowly construed and applied only to employees who are clearly within the terms and spirit of the exemptions; and

(2) The burden of proof rests with the employer who asserts the exemption.

Thus, if there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be ruled nonexempt.[42]

The need for a legal basis for the pay of each employee creates a contravening requirement. Agencies must comply with the pay provisions of title 5, U.S.C. (or other statutes governing the pay of certain employees) unless additional payment under FLSA provisions is *required*. Thus, any employee who meets exemption criteria *must* be exempted, because there is no legal basis for paying any such employee in excess of the pay due under title 5, U.S.C.

### IV.

A) DOL Regulations

The FLSA specifically gave to the Secretary of the DOL the authority to define and delimit by regulation the general terms of the statutory executive and administrative exemptions. This authorization is a delegation that makes DOL regulations control exemption standards. As a result, OPM's FLSA exemption regulations must be consistent with DOL's defining regulations in

29 C.F.R. Part 541. The Supreme Court, in *Chevron v. NRDC*, teaches the deference owed a congressional mandate such as that given to DOL.[43]

If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. (footnotes omitted).

Defendant argues that the rule of *Chevron v. NRDC* applies with equal vigor to regulations issued by OPM pursuant to the 1974 authorization to administer application of the FLSA to federal employees. This may be true with regard to application of FLSA to employees who are under the civil service classification and payment statutes. Such deference, however, could hardly apply to procedures that implemented a determination of classification equivalents for employees who were not subject to Title V for classification, or for pay, particularly when there is no longstanding practice in the application of such procedures to UD.

The DOL regulations defining and delimiting the term "employee employed in a bona fide executive or administrative capacity" are contained in 29 C.F.R. Part 541. Subpart A sets forth the requirements of the exemption (Sections 541.0 to 541.2). Subpart B sets forth Interpretations applicable to those requirements (Executive Capacity—Sections 541.99—541.119; Administrative Capacity—Sections 541.201—541.215).[44]

---

**42.** *Id.* at 11.

**43.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (*Chevron v. NRDC*).

**44.** FLSA regulations have been gestated in DOL since 1938 and in OPM since 1974. The regulations characteristically are prolix and devoted to a multitude of minutiae. 29 C.F.R. Part 541 requires 52 pages. Although the OPM regulations for pay administration under the FLSA, 5 C.F.R. Part 551, occupy only 12 pages, ancillary

The DOL executive exemption [45] applies to any employee who satisfies all of the following requirements:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of subdivisions thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, ... of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: .. and

(f) Who is compensated for his services on a salary basis at a rate of not less than $250 per week....

The Interpretations for "primary duty" [46] include the following explanations:

A determination of whether an employee had management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty.

Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor....

The Interpretations for "salary basis" [47] includes the following explanations:

(a) An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under this employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.

The regulation lists six categories of deductions, which include:

(1) An employee will not be considered to be "on a salary basis" if deductions from his predetermined compensation are made for absences occasioned by the employer or by the operating requirements

regulations by OPM and in the Treasury Department reflect the prodigious and arcane production of personnel office procedures. It is customary to show in the margin the complete text of provisions that are digested or referenced in the body of an opinion. This procedure is precluded here by the exceptional bulk of regulatory materials in the record.

**45.** 29 C.F.R. § 541.1 (1991).

**46.** 29 C.F.R. § 541.103.

**47.** 29 C.F.R. § 541.118.

of the business. Accordingly if the employee is ready, willing, and able to work, deductions may not be made for time when work is not available.

(2) Deductions may be made, however, when the employee absents himself from work for a day or more for personal reasons, other than sickness or accident. . . .

(3) Deductions may also be made for absences of a day or more occasioned by sickness or disability (including industrial accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by both sickness and disability. . . .

(4) Deductions may not be made for absences of an employee caused by jury duty, attendance as a witness, or temporary military leave. . . .

(5) Penalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried status. . . .

(6) The effect of making a deduction which is not permitted under these interpretations will depend upon the facts in the particular case. . . .

The administrative exemption [48] is more detailed and more flexible. The regulation contains alternative provisions in the listed requirements, applicable to any employee, as follows:

(a) Whose primary duty consists of either:

(1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer . . ., or

(2) The performance of functions in the administration of a school system, or educational establishment or institution, . . . and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity. . . ., or

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent, . . . of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

(e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $250 per week. . . .

The Interpretations define in detail the various terms and phrases in the listed requirements, including, *i.e.*, three types of "administrative" employees,[49] three categories of work,[50] nonmanual work and office work.[51] All definitions center upon the test for activities directly related to managerial operations in running the business, as distinguished from the day-to-day carrying out of its affairs or merely providing information.

The requirement "directly related to management or general business operations" in Section 541.2(a)(1) is explained as follows: [52]

(a) The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating the administrative operations of a business as distinguished from "production". . . . work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

48. 29 C.F.R. § 541.2.

49. 29 C.F.R. § 541.202.

50. Id.

51. 29 C.F.R. § 541.203.

52. 29 C.F.R. § 541.205.

(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control....

(c) As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree, ...

The Interpretations for "primary duty" [53] includes the following:

(a) The definition of "administrative" exempts only employees who are primarily engaged in the responsible work which is characteristic of employment in a bona fide administrative capacity. Thus, the employee must have as his primary duty office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers, or, in the case of "academic administrative personnel," the employee must have as his primary duty work that is directly related to academic administration or general academic operations of the school in whose operations he is employed.

(b) In determining whether an employee's exempt work meets the "primary duty" requirement, the principles explained in § 541.103 in the discussion of "primary duty" under the definition of "executive" are applicable.

The Interpretation for "salary basis" as used in 29 C.F.R. § 541.2(e) states that the explanation made in connection with the definition of "executive" is applicable also in the definition of "administrative." [54]

On September 6, 1991, DOL published an interim rule by which a new Section 541.5d was added to 29 C.F.R. Part 541, Subpart A, and a proposed rule that added a new paragraph 541.118(a)(6)(ii) to Part 541, Subpart B.[55]

The purpose of these revisions is to provide an exception from certain provisions requiring payment "on a salary basis" applicable only to public sector employees. The revisions allow governmental entities to restore eligibility for exemption under the rules governing payment "on a salary basis" at 29 C.F.R. § 541.118(a)(6), for otherwise exempt public employees subject to pay systems that provide the use of paid leave and, when accrued leave is not used, result in deductions from pay for absence of less than one work day. The DOL noted:

In administering the FLSA in the public sector *, the Department has become aware that few public employers compensate employees in a manner that meets the "on a salary basis" requirement for exemption under the current regulation. Governmental payroll systems commonly prohibit paying employees for time not actually worked. Systems of leave in the public sector (as often is the case in the private sector) are generally relied on as the exclusive method to permit employees who might otherwise not be compensated for periods of absence to avoid reduction of compensation in connection with such absences.[56]

---

*footnote omitted.

The DOL discussed the differing results in court decisions that have construed the

---

53. 29 C.F.R. § 541.206.

54. 29 C.F.R. § 514.212.

55. 56 Fed.Reg. 45824 (interim rule, Sept. 6, 1991), 56 Fed.Reg. 45828 (proposed rule, Sept. 6, 1991).

56. 56 Fed.Reg. 45824.

"on a salary basis" requirement and noted that confusion from the diverging judicial interpretations has resulted in "exposure of governmental employers to potentially enormous and generally unexpected back wage liabilities to employees, some of whom would clearly be exempt if duties and amount of compensation alone were examined." [57]

New 29 C.F.R. § 541.5d reads:

§ 541.5d Special Provisions Applicable to Public Sector Employers (Federal, State and Local Governments)

(a) A Federal, State or local government employee ("public employee") who otherwise meets the requirements of § 541.118 shall not be disqualified from exemption under §§ 541.1, 541.2, or 541.3 of this part on the basis that such employee is paid according to a pay system established by statute, ordinance, regulation or public policy under which the employee accrues personal leave and sick leave and, absent the use of such accrued leave (because the leave has been exhausted or by the employee's choice), requires the public employee's pay to be reduced ("leave without pay") for absences, for personal reasons or because of illness or injury, of less than one work day.

(b) Deductions from a public employee's pay that are not regular and recurring for absences due to a budget-required furlough shall not disqualify the employee from being paid "on a salary basis" except in the workweek in which such deductions occurred.[58]

New 29 C.F.R. § 541.118(a)(6)(ii) reads:

If a Federal, State or local government (i.e., public sector) employer's pay system is as described in § 541.5d, and either:

(A) the public employer has made no actual deductions from the pay of otherwise-exempt public employees for absences, for personal reasons or because of illness or injury, of less than one work day before the effective date of § 541.5d (i.e., September 6, 1991); or,

(B) the employer reimburses any otherwise-exempt public employees for deduction from salary that were made for absences, for personal reasons or because of illness or injury, of less than one work day occurring before the effective date of § 541.5d (i.e., September 6, 1991);

then eligibility for exemption for public employees who otherwise meet the requirements of § 541.118 and who were subject to such pay system will not be defeated for failure to pay "on a salary basis." [59]

## B) OPM Regulations

The FLSA regulations promulgated by OPM are issued pursuant to 29 U.S.C. § 204(f). 5 C.F.R. Part 551 contains the "regulations, criteria, and conditions" that OPM has prescribed for administration of the FLSA; it "supplements the Act, and must be read in conjunction with it." [60] An employing agency should exempt for FLSA overtime provisions any employee who meets the exemption criteria of Subpart B, and "such supplemental interpretations or instructions as shall be issued" by OPM.[61] General principles governing exemptions reflect established court rules of construction and burden of proof,[62] as follows:

In all exemption determinations, the agency shall observe the principles that—

(a) Exemption criteria shall be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption.

(b) The burden of proof rests with the agency that asserts the exemption.

(c) All employees who clearly meet the criteria for exemption must be exempted.

---

57.  *Id.* at 45825.

58.  *Id.*

59.  56 Fed.Reg. 45828, 45830.

60.  5 C.F.R. § 551.101(c) (1992).

61.  5 C.F.R. § 551.201.

62.  5 C.F.R. § 551.202.

596

Exemption criteria are focused on employees subject to the Classification Act.[63] The regulation provides:

(a) Any employee properly classified at GS-4 or below (or the equivalent level in other white collar pay systems) shall be nonexempt;

(b) Any employee properly classified at GS-5 through GS-10 (or the equivalent level in other white collar pay systems) shall be exempt only if the employee is an executive, administrative, or professional employee as defined in §§ 551.204, 551.205, and 551.206 of this subpart.

Executive exemption criteria [64] are as follows:

An "executive" employee is a supervisor, foreman, or manager who manages a Federal agency or any subdivision thereof (including the lowest recognized organizational unit with a continuing function) and regularly and customarily directs the work of at least three subordinate employees (excluding support employees) and meets all the following criteria:

(a) The employee's primary duty consists of management or supervision. The primary duty requirement is met if the employee—

(1) Has authority to select or remove and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and

(2) Customarily and regularly exercises discretion and independent judgment in such activities as work planning and organization; work assignment, direction, review, and evaluation; and other aspects of management of subordinates, including personnel administration.

(b) In addition to the primary duty criterion that applies to all employees, foreman level supervisors in the Federal Wage System (or the equivalent in other wage systems), employees at the GS-7 through GS-9 level subject to section 207(k) of Title 29, United States Code, and employees classified at the GS-5 or GS-6 level (or equivalent in other white collar pay systems) must spend 80 percent or more of the worktime in a representative workweek on a supervisory and closely related work.

The administrative exemption criteria [65] are as follows:

An administrative employee is an advisor, assistance, or representative of management, or a specialist in a management or general business function or supporting service who meets all of the following criteria:

(a) The employee's primary duty consists of work that—

(1) Significantly affects the formulation or execution of management policies or programs; or

(2) Involves general management or business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) The employee performs office or other predominantly nonmanual work which is—

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) The employee must frequently exercise discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

(d) In addition to the primary duty criterion that applies to all employees, General Schedule employees classified at GS-5 or GS-6 (or the equivalent in other white collar systems) must spend 80 percent or more of the worktime in a representative workweek on administrative

63. *See* Section 551.203.

64. Section 551.204.

65. Section 551.205.

functions and work that is an essential part of those functions.

The OPM exemption regulations in 5 C.F.R. §§ 551.204 and 551.205 are supplemented by letters and bulletins in the Federal Personnel Manual System to department and agency heads. FPM Letter No. 551–7, July 7, 1975, and FPM Letter No. 551–13, February 21, 1978, are basic guidelines with the most significance in defining the terms of the exemption regulations. The attachment to FPM Letter No. 551–7, in Part B, provided guidance to application of the exemptions. It reads in part as follows:

1. *Meaning of terms:* Many of the terms used in FLSA exemption criteria have acquired well-established interpretations that sometimes differ from the customary interpretation in the Federal service. In applying the definitions, the following terms shall have the meaning described herein. These meanings *do not* carry over to other personnel management functions.

    a. *Primary duty.* As a general rule, the primary duty is that which constitutes the major part (over 50%) of the employee's work. However, a duty which constitutes less than 50% of the work can be credited as the primary duty for exemption purposes *provided* that duty:

    (1) Represents the most important duty;

    (2) Controls the classification of the position (i.e., if that duty were removed, the position would be classified at a lower grade level); and

    (3) Is clearly exempt work in terms of the basic nature of the work, frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.

FPM Letter No. 551–13 revised and superseded certain portions of FPM Letter No. 551–7 pertaining to exemption of executive employees. The purpose of the revision was explained as follows: [66]

Specifically, it provides guidance on the application of General Schedule (GS) and Federal Wage System (FWS) supervisory classification standards in applying the executive exemption. The revised Supervisory Grade–Evaluation Guide published in January 1976 (Transmittal Sheet 23, Position–Classification Standards for General Schedule Positions) establishes a minimum core of duties and responsibilities necessary for positions to be designated as "supervisory." This has made it possible to provide a better correlation between the classification of supervisory positions and the FLSA executive exemption....

2. *Use of the Supervisory Grade–Evaluation Guide and Job Grading Standard for Supervisors in Making FLSA Executive Exemption Determinations*

With the exception of the percentage of time criterion, General Schedule employees occupying positions properly classified as "supervisory" under the revised Supervisory Grade–Evaluation Guide and Federal Wage System supervisors whose positions fully meet or exceed the "Foreman range of responsibility" defined in the Job Grading Standard for Supervisors meet the executive exemption requirements of the FLSA.... General Schedule supervisory employees in positions classified below GS–10 and Foreman level supervisors in the FWS *remain non-exempt* if they do not spend 80% or more of the worktime in a representative workweek on supervisory and closely related work. The supervisory classification standards may also be used in determining the applicability of the executive exemption to employees in other white and blue collar pay systems not classified under the General Schedule or Federal Wage System.

The instructions in the attachment to FPM Letter No. 551–13 amended the previous definition of Primary Duty. The attachment to FPM Letter No. 551–7 was amended as follows:

Page 6. a. *Primary duty* (continued from page 5)

---

**66.** FPM Letter 551–13, 1–2 (Feb. 2, 1978).

DELETE: Statements (1), (2) and (3). SUBSTITUTE:

(1) constitutes a substantial, regular part of a position, and

(2) governs the classification and qualification requirements of the position, and

(3) is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.

The following explanation was given for the substitution of the new definition:

For example, employees occupying supervisory positions at GS–10 and above need not spend a majority of their time performing supervisory and closely related duties to be determined exempt. When such positions are classified by use of the Supervisory Grade–Evaluation Guide (e.g., grade and/or title), the employee is exempted by virtue of exempt supervisory duties which control the classification of the position as supervisory. This example is not applicable to employees occupying supervisory positions below GS–10, because the additional percentage of time criterion which must be applied to all employees below GS–10, would not be met.

After the 1987 decision of the D.C.Circuit in *AFGE v. OPM*, interim amendments to 5 C.F.R. §§ 551.203 and 551.204 were published[67] and FPM Bulletin No. 551–21, February 4, 1988, was issued to clarify the exemption as applied to a supervisor. The notice in Bulletin No. 551–21 contained the following explanation:

These regulations would eliminate the section providing for a presumption that employees classified at GS–11 and above are exempt (not covered by the overtime provisions of the FLSA) and would change the criteria for determining whether an employee is an executive (i.e., an exempt supervisor or manager) to make them more consistent with pertinent aspects of the Department of La-

bor's criteria for determining that a non-federal employee is an executive.[68]

The explanation for the interim amendment to the executive exemption criteria in Section 551.204 included the following:

The Court found that § 551.204 was "susceptible to a more expansive interpretation" (indicating that exemption was easier to reach) than is possible when applying the comparable Department of Labor (Labor) regulation (29 CFR 541.1). The Court indicated that Labor's executive exemption criteria more narrowly limit the possibility of an "exempt" finding than OPM's executive exemption criteria do. The Court said, for example, that under Labor's executive exemption criteria, an exempt employee must "customarily and regularly" direct the work of others and must manage the entire "enterprise" in which he is employed or at least a "department" thereof.

Although criteria as limiting as Labor's criteria are stated or implied in the supervisory classification standards to which 5 CFR 551.204 refers, these criteria are not stated in the regulation itself.

Consequently, the revised § 551.204 contains criteria for determining that the primary duty of an employee's work is "executive," without reference to the classification standards or other sources of information. The criteria include language the Court used to exemplify factors it concluded were omitted in the previous regulation, and are more directly consistent with Labor's description of its regulatory criteria for executive exemption.[69]

V.

The first complaint in these consolidated cases was filed on September 18, 1986. At that time the *Lanehart* and *AFGE v. OPM* cases were pending, and these cases were only part of the numerous challenges to various aspects of OPM's regulations dealing with FLSA coverage of government

**67.** 53 Fed.Reg. 1739 (Jan. 22, 1988).

**68.** Attachment 2 to FPM Bulletin No. 551–21 2.

**69.** Attachment 1 to FPM Bulletin No. 551–21 1.

employees that had been underway since 1983. Since 1986, the *Lanehart* and *AFGE v. OPM* decisions were rendered in 1987; OPM regulations in 5 C.F.R. §§ 551.203(c) and 551.204 were amended in January 1988; and the Tracey report with equivalent GS classifications was issued in October 1988. Trial of these cases was concluded in May 1991, and in September 1991, the DOL amended 29 C.F.R. §§ 541.5d and 541.118(a)(6)(ii) to deal with the paid "on a salary basis" requirement as applied to exemptions for public sector employees. These changes have had an impact on the parties' approach to issues of fact and law applicable to delineation of work done by the subject UD sergeants and lieutenants. The objective at trial was to adduce facts applicable to the normal day-to-day work in the lieutenant and sergeant positions upon which counsel had been unable to agree.

During the course of trial the parties reached agreement as to the type of activities defendant viewed as supervisory in nature, and attention became focused on the scope of a supervisor classification as related to "primary duty" and "management" concepts. As a result, the parties reached agreement on a substantial number of specific activities in the day to day work in the relevant positions. Appendices A & B, attached, contain descriptions of work the parties were able to stipulate. These stipulations are adopted by the court. The parties also stipulated that the duties and responsibilities of all UD sergeants and all UD lieutenants included those listed in UD Manual UND–15, as follows:

### Lieutenants

They shall attend roll calls unless otherwise assigned and shall assist the Watch Commander during and after roll call according to the prevailing procedure.

They shall, in the absence of a Captain, be prepared to assume the duties and responsibilities normally assigned to that rank.

They shall submit detailed, accurate, and neat reports as required.

They shall set an example to their subordinates in sobriety, discretion, skill, industry, and the observance of proper discipline; and shall at all times appear neatly attired, clean in person and equipment.

They shall supervise and instruct their subordinates in the policies and procedures of the Force.

They shall require from their subordinates a proper attitude of respect and obedience.

They shall be familiar with and comply with all applicable rules, regulations, and instructions as set forth in the Uniformed Division Manual.

They shall, under minimum supervision, perform all protective assignments in a diligent, precise, and tactful manner.

They shall assist in training new and less experienced personnel, and by personal conduct and demeanor shall be an example to their subordinates.

They shall note, correct, or report to the Watch Commanders/Captains, any misconduct or gross violations of the rules and regulations on the part of those subordinate to them.

They shall work harmoniously and effectively with others for the purpose of carrying out the mission of the Force in professional manner.

They shall give proper recognition to members whose performance exceeds the satisfactory level. They shall point out unsatisfactory performance to their subordinates and counsel them concerning the correction of their deficiencies.

### Sergeants

They shall, when required, attend/conduct roll calls and assist the Lieutenant-in-charge.

They shall exercise supervisory responsibility over subordinate officers.

They shall be assigned duties and responsibilities consistent with their rank.

They may be designated Acting Lieutenants when necessary and should be knowledgeable of the duties and responsibilities of that rank.

They shall perform such other assignments as may be directed by senior officers.

They shall become familiar with the mission, duties, and laws pertaining to the protective responsibilities of the Force.

They shall be responsible for the proper exercise of protective functions, and shall instruct and assist those under their supervision in the proper performance of their duties.

They shall visit officers on their posts or beats as often as practicable during the tour of duty.

They shall require from their subordinates a proper attitude of respect and obedience.

They shall set an example to their subordinates in sobriety, discretion, skill, industry, and the observance of proper discipline; and shall at all times appear neatly attired, clean in person and equipment.

They shall assist in training new and less experienced personnel, and by personal conduct and demeanor shall be an example to their subordinates.

They shall note, correct, or report to the officer-in-charge, any misconduct or gross violations of the rules and regulations on the part of those subordinate to them, and shall give proper recognition to those subordinate members whose performance is above average.

They shall become familiar with and comply with all applicable rules, regulations, and instructions as set forth in the Uniformed Division Manual.

They shall work harmoniously and effectively with others for the purpose of carrying out the mission of this Force in a professional manner.[70]

Determination of whether the primary duty of the UD sergeants and lieutenants is directly related to management and management policies involves an examination that locates their work in the context of the organization where it is performed. The UD, in terms of manpower, is a small part of the law enforcement organization in which it operates.

In the Treasury Department, law compliance activities in four areas are the responsibility of the Assistant Secretary (Enforcement): The Bureau of Alcohol, Tobacco, and Firearms, the U.S. Customs Service, the U.S. Secret Service, and the Federal Law Enforcement Training Center. Enforcement of the internal revenue laws is the responsibility of the Commissioner of Internal Revenue.

Law enforcement activities for which the Secret Service is responsible are extensive.[71] They include:

—Provision of protective services to certain officials as prescribed by statute, including the President, Vice President-elect, Vice President-elect, and former Presidents,

—Provision of security services at the White House complex and other Presidential offices, the temporary official residence of the Vice President in the District of Columbia, and foreign diplomatic missions in the Washington, D.C., metropolitan area and throughout the United States, its territories and possessions, as prescribed by statute;

—Investigation and arrest of any person violating the laws of the United States relating to currency, coins, obligations, and securities of the United States or of foreign governments;

—Suppression of forgery and fraudulent negotiation or redemption of Federal Government checks, bonds, and other obligations or securities of the United States;

—Investigations relating to certain criminal violations of the Federal Deposit Insurance Act, the Federal Land Bank Act, and the Government Losses in Shipment Act; and

—Detection and arrest for violation of laws pertaining to electronic frauds, transfer funds, credit and debit card frauds, false identification documents or devices, and computer access fraud.

The bulk of the Treasury Department protective and security services are provided by Secret Service classified personnel.

---

**70.** UD Manual, UND–15, at 7–8 (Dec. 15, 1987).

**71.** *The United States Government Manual,* Office of the Federal Register, 501–02, (1991–92).

These special agents are not in uniform, and their work is done in plain clothes.

In 1989, the Treasury Department had a total of 11,504 law enforcement employees, of which 10,494 were classified in the civil service system. The unclassified law enforcement employees in the UD totalled 1,010. Treasury Department law enforcement activities, in addition to protective and security services provided by UD personnel, were provided primarily by criminal investigators involved in the investigation and apprehension of individuals suspected of criminal activities such as (1) counterfeiting and credit card fraud (Secret Service), (2) criminal tax fraud and money laundering (Internal Revenue Service), (3) smuggling of all kinds of contraband including drugs (Customs Service), and (4) violations of federal firearms, liquor, and tobacco laws (Bureau of Alcohol, Tobacco and Firearms).[72]

The chain of management responsibility for protective and security services in the Secret Service is attenuated. As of October 1990, the Secret Service operated through seven components, called Offices, each headed by a Deputy Director.[73] The Personnel Division in the Office of Administration makes decisions relative to pay classifications and FLSA exemptions for all Secret Service personnel, including personnel in the UD.

The Office of Protective Operations has ten components, called Divisions, one of which is the UD, each headed by a Deputy Assistant Director (DAD).[74] The UD Chief provides for the planning, direction, coordination, and implementation of protective policies, programs and operational responsibilities defined in 3 U.S.C. § 202. He reports to a DAD.

The UD has three components, called Branches,[75] each headed by a deputy chief. Branch components are called sections. The White House Branch has three operational sections (A, B, & C); the Foreign Missions Branch has four operational sections (A, B, C & V.P.); and the Administration and Program Support Branch has three sections (Administration, Training, and Program Support). Each section is headed by a captain.

The Program Support Section of the Administration and Program Support Branch includes the Countersniper Unit and the Canine Unit, each headed by a lieutenant. In the White House Branch and the Foreign Missions Branch, section designations are based upon the time of 8–hour tours of duty: Section A—Midnight, Section B—Day Work, and Section C—Three o'clock Tour.[76] In the White House Branch sections, manning typically is six officers and one sergeant per section; in the Foreign Missions Branch sections, manning typical-

---

**72.** Report of the National Advisory Commission on Law Enforcement (NACLE), 34 (Apr. 1990).

**73.** Office of Government Liaison & Public Affairs, Office of Inspection, Office of Protective Operations, Office of Protective Research, Office of Investigations, Office of Administration, and Office of Training.

**74.** Presidential Protective Division, Vice Presidential Protective Division, Uniformed Division, Dignitary Protective Division, Reagan Protective Division, Ford Protective Division, Carter Protective Division, Johnson Protective Division, Special Programs Division, Special Services Division.

**75.** White House Branch, the Foreign Missions Branch, and the Administration and Program Support Branch.

**76.** The record is not clear as to the start-stop times of the UD A, B, and C sections. UD

Manual, Section UND–19, at 5 (Dec. 15, 1987) defines a basic work week to mean a 40–hour work week, exclusive of roll call time, scheduled on five 8–hour days. A calendar day for all purposes begins at 2330 hours and extends to 2330 hours the following day. The Deputy Chief of the White House Branch testified Section A was the midnight tour, Section B was day work tour and Section C was the 3:00 o'clock tour. This would provide: Section C—1500 hours to 2300, Section A—2300 hours to 0700, and Section B—0700 hours to 1500. A UD inspector testified that the Foreign Missions Branch Section A was from 10 p.m. to 6 a.m. (2200 hours to 0600), Section B started at 6 a.m. and lasted to 2 or 2:30 p.m. (0600 to 1400), and Section C was from 2 p.m. to 10 or 10:30 p.m. (1400 hours to 2200). In the posttrial brief, defendant identified all UD shifts as Section A—midnight, Section B—day work, and Section C—2:30 p.m.—10:30 p.m. This would provide: Section C—1430 hours to 2230, Section A—2230 hours to 0630, and Section B—0630 to 1430.

ly is 18 people per section, with a minimum of one captain and one or two lieutenants.

Work in White House Branch sections is divided into sectors, which are geographic zones within the White House area. There are approximately ten sectors, designated by name, rather than by number, *i.e.*, northwest sector, east sector, westwing mansion sector, etc. Work in Foreign Missions Branch sections is divided into three geographical areas called zones: Zone 1— Downtown (George Washington University and White House), Zone 2—Kalorama Circle area, and Zone 3, Upper N.W., Washington. Patrol cars in the zones operate within a specific geographic area in the zone and are themselves referred to as zones, *i.e.*, Zone 1 has two patrol cars which are called Zone 11 and Zone 12; Zone 2 has two patrol cars, which are called Zone 21 and Zone 22; Zone 3 has three patrol cars, which are called Zones 31, 32 and 33. Patrol cars numbered Zones 11 to 33 are manned by UD officers. Patrol cars manned by sergeants and lieutenants also are referred to by zone number, based on operations in Zones 1, 2, or 3. Patrol cars operated by lieutenants are named Zone 51, Zone 52 or Zone 53; patrol cars operated by sergeants are named Zone 61, Zone 62 or Zone 63. Under normal circumstances patrol cars operate as a one-person unit.

When an operational sergeant or operational lieutenant does the work of an officer by standing guard in the White House westwing sector, it strains reason to conclude that they are engaged in management policies or general management of protective and security operations for which the Secret Service is responsible. Similarly, when operational sergeants or operational lieutenants man patrol cars in Zone 1 of Foreign Missions Branch Section A, and do the work of the officer in Zone 11, they hardly can be engaged in management policies or general management of the protective and security operations for which the Secret Service is responsible. Responsibility for zones or sectors does not establish management of a federal agency, or any subdivision thereof. UD sergeants and lieutenants do not exercise individual discretion to an extent sufficient to be truly engaged in management policies or general management of the protective and security services for which the Secret Service is responsible.

The designation "operational" as used in the UD has a variety of meanings. There is no separate area of work or position that is identified by the designation "operational sergeant" or "operational lieutenant." The UD is not in the classified civil service and detailed job descriptions historically have not been prepared. Work descriptions in the UD Manual are general and functional. The use of "operational" in the Tracey report as part of a position designation was a result of the circumstance that, in practice, the UD characterized its jobs as operational positions, administrative positions or specialized positions.

The parties stipulated that some of the duties and responsibilities of operational lieutenants in the Foreign Missions Branch are set forth in the UD Manual under the heading "Patrol Operations." UD Manual, Section FMB–2, at 7 (Dec. 15, 1987), however, does not use the term operational. It identifies, under supervisory and administrative staffing, four lieutenants assigned to each section who engage in supervisory patrol activities, and who, in addition may be assigned to a specific area of responsibility in administration, training and safety, vehicles and equipment, and the substations. The term "operational lieutenant" does not identify an independent, separate position with specific duties. Nor are there position descriptions for administration, training and safety, vehicles and equipment, or the other areas cited. The operational lieutenant in a Foreign Missions section, however, could be designated to do additional duties in the other work areas.

In essence, the term "operational" does not indicate a particular job or specific types of work. It identifies an employee who is engaged in the general day-to-day work of the section. The work at times includes doing the same work as that done

by UD officers.[77]

Executive and administrative exemptions, under both the DOL and OPM regulations, must be related to management operations or policies. Activities that go to the management of the UD must be distinguished from the UD's general production operations. The primary function of the UD as a unit of the Secret Service is law enforcement for the protection and security of the President, Vice President, White House complex, Foreign Diplomatic Missions, and other official buildings and offices. The operational activities of the sergeants and lieutenants are production services of the organization. They are not necessarily taking part in general management or management policies. An employee who performs routine work in collecting, compiling, or presenting data on which some other employee performs the evaluation processes, is not in management and the time spent on such tasks should not be counted as participating in an exempt administrative function.

FPM Letter No. 551–7 distinguished routine production functions from general management, business or supporting services. Attachment to FPM Letter No. 551–7 at 9 states:

Neither the organizational location nor the number of employees performing identical or similar work changes general management, business or servicing functions *into production functions*. However to warrant exemption, each employee's work must involve substantial discretion on matters of *enough importance* that the employee's actions and

decisions have a *noticeable impact on the effectiveness* of the organization advised, represented or serviced. (Emphasis supplied.)

The distinction between the production of a law enforcement agency and its internal management is judicially recognized.[78] The distinction is statutorily based. The FLSA applies to "Enterprises engaged in commerce or in the production of goods for commerce." This concept has been expanded to mean an enterprise which "is an activity of a public agency."[79] The term "public agency" means "the Government of the United States," and any "agency of the United States."[80] The employees of an enterprise which is a public agency shall be deemed "to be employees engaged in commerce, or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce."[81]

These provisions make it clear that FLSA coverage treats governmental employees at the local, state and federal levels as being "engaged in commerce" the same as if they were employed in a commercial enterprise in the private sector. A public employee whose primary law enforcement activity is the production of the agency, as opposed to the internal management of the agency, is nonexempt in the absence of a showing that management work constitutes more than 50 percent of the work in the position.

The 50 percent rule is used by DOL to interpret "primary duty."[82] FPM Letters Nos. 551–7 and 551–13 use wording that is

---

**77.** The confusion generated by use of the designation "operational" is apparent in the analysis in the Tracey report that failed to recognize the substantial differences between the day-to-day work of sergeants and lieutenants in the Foreign Missions Branch and the day-to-day work of such employees in the White House Branch. Another result of the use of the designation "operational" was the failure to recognize that the Feb. 20, 1991, list of positions to be tried involved four separate operational positions in these Branches, rather than the listed two. In posttrial briefing defendant recognizes the positions listed as Control Center Lieutenant and Control Center Sergeant in fact refer at least to three different jobs and types of work. Plaintiff

in posttrial briefing continued to lump the lieutenant and sergeants jobs in the White House Branch Control Center with those in the Foreign Missions Branch Control Center.

**78.** *D'Camera v. District of Columbia,* 693 F.Supp. 1208, 1210–11 (D.D.C.1988); *Roney v. United States,* 790 F.Supp. 23 (D.D.C.1992).

**79.** 29 U.S.C. § 203(s)(6).

**80.** 29 U.S.C. § 203(x).

**81.** 29 U.S.C. § 203(s)(6).

**82.** 29 C.F.R. § 541.103.

consistent with the DOL regulations. The letters define primary duty as:

> As a general rule, the primary duty is that which constitutes the major part (over 50%) of the employee's work. However, a duty which constitutes less than 50% of the work can be credited as the primary duty for exemption purposes *provided* that duty: (1) constitutes a substantial, regular part of a position, and (2) governs the classification and qualification requirements of the position, and (3) is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.[83]

Defendant used a two-step procedure in its determination that the sergeants and lieutenants had either an executive exemption or an administrative exemption: (1) determination of a grade level equivalency to General Schedule grades in the classified service; and (2) determination of the FLSA exemption by application of OPM regulations. The General Schedule grade level equivalencies were made by Susan Tracey and Terry Evans, classification experts in the Secret Service Personnel Division. Ms. Tracey determined grade level equivalencies for the executive positions; Mr. Evans determined the grade level equivalencies for the administrative positions.[84] Both steps were done in the Tracey report. Grade equivalency classifications and exemption determinations were made for all positions considered.

The Personnel Division undertook the study after the complaints were filed in these cases. The only reason equivalent GS grades were made under classification procedures was to reach a determination as to the FLSA exemption. At trial, defen-

dant's expert on the FLSA exemption designation under OPM regulations and guidelines, J. Wilfred Tapping, testified the exempt classifications in the Tracey report were valid. This conclusion, however, was based on the Tracey report's General Schedule classification of the sergeants and lieutenants positions covered.

In 1986 when the complaints were filed, and in 1988 when the Tracey report was made, the Secret Service Personnel Division records carried UD employees in Pay category—LE, Series Code 083, and at grades ranging from 1 (for UD officers) to 11 (for the UD Chief). On the pay records, a UD sergeant would be carried as an LE–083–4 and a lieutenant as an LE–083–5.[85] The Personnel Division did not have descriptions of positions occupied by members of the UD and there was no listing of the duties in each grade because the UD was exempt from the Classification Act.

In the preparation of equivalent grade classifications, Ms. Tracey and Mr. Evans did not conduct a desk audit of incumbents in the positions considered in order to discover the specific duties performed by UD sergeants and lieutenants. A position audit of the type required by OPM regulations, and the type normally done by a classifier, to determine in the first instance a proper GS grade classification was not done. Instead, a team of three senior UD officials was interviewed: a deputy chief in the White House Branch and two captains. These three senior officials had a great deal of experience in the UD. Among them, they had either served in or directly supervised persons serving in virtually all of the sergeant and lieutenant positions in the UD.

In the interviews, Ms. Tracey and Mr. Evans secured information about 48 posi-

---

**83.** Attachment to FPM Letter No. 551–7 at 5–6; Attachment to FPM Letter No. 551–13 at 1.

**84.** In the Tracey report, the Control Center sergeant exemption was based on OPM's administrative exemption criteria. Mr. Evans determined the position met OPM executive exemption criteria. In posttrial briefing, defendant asserts the Control Center sergeants at the White House and Foreign Missions Branches

are exempt pursuant to the executive exemption.

**85.** LE stands for Law Enforcement, 083 is a general categorization for Federal Police, comparable to Police Series GS–083, and 1, 4, 5 or 11 represents the rank of the pay chart for D.C. police. Element LE and the numbers 1, 4, 5 or 11 are derived from D.C.Code, Title IV.

tions in the UD by asking questions couched in the wording of the Supervisory Grade Evaluation Guide and the FLSA criteria in 5 C.F.R. §§ 551.204 and 551.205. Based on "yes" or "no" responses of the senior officials on the team, the Personnel Division would write-up the work descriptions in the Tracey report. In many instances the write-ups are verbatim or closely parallel to the wording in the Guide or the OPM exemption regulation. The team members did not participate in the drafting process. In their participation in the study, the team members did not examine a body of written information, other than the UD Manual. No current time studies were made, and their responses were based on recollection and estimates.[86]

OPM in FPM Letters Nos. 551-7 and 551-13 recognizes that the determination of equivalency classifications to GS schedule grade levels is appropriate in the application of exemption criteria.[87] In making the grade level equivalencies, Ms. Tracey used OPM's Supervisory Grade Evaluation Guide (Guide),[88] the Police Officer's Standard, GS-083 and the Criminal Investigators Standard, GS-1911. The process involved: (1) ascertaining the base grade level of UD officers who were subject to supervision of plaintiffs; (2) the addition of points to this base GS level pursuant to procedures established in the Guide; (3) using the point score to determine the number of grades to be added to the base GS level; and (4) determination of the final classification.

Ms. Tracey's work papers used in her determinations of equivalent grade levels for sergeants and lieutenants found to be in the executive exemption are in the record. These papers show the factors considered and the numerical adjustments made pursuant to instructions in the Guide in the determination of the final equivalent GS classification.[89]

The base level of work was that of a UD officer LE-083-1, and the equivalent GS grade established was GS-8. This determination was explained as follows:

> While Uniformed Division positions are not classified, application of the GS-083 Police Officer Standard and protection-related portions of the GS-1811 Criminal Investigator standard to the duties performed results in a grade level determination of GS-8/9 for the Officer positions. For the purposes of this evaluation, the more conservative, GS-8 grade level is being used.

Mr. Evans used Ms. Tracey's GS-8 grade as the equivalent for Factor I in the positions he classified.

The work papers show that the positions evaluated were combined in groups, which combinations also were carried over into the Tracey report, that did not distinguish substantial differences in the work done in the grouped positions. The groups were:

Sergeant—Operational, White House & Foreign Missions

Sergeant—Canine/Special Operations/Countersniper

---

**86.** Plaintiffs contend that the Tracey report team's collective responses were entirely manipulated to fit within the exemption criteria, that the methodology was egregious, done in bad faith, and lacks credibility. These charges are excessive and need not be addressed here. Defendant's methodology is flawed in other respects that makes suspect the Tracey report classifications. It would be naive, however, to assume that the Personnel Division representatives and senior UD officials were not aware that the positions historically had been considered exempt, that plaintiffs' claims had been filed, that *AFGE v. OPM* had been decided, and that the OPM regulations had required amendment.

**87.** Attachment to FPM Letter No. 551-7, at 13 and FPM Letter No. 551-13, at 2.

**88.** OPM, *Supervisory Grade Evaluation Guide,* (Jan. 1976) (Guide).

**89.** The elements considered were:

Factor I —Base Level of Work
Factor II —Kind and Degree of Supervision Exercised (4 subparts)
Factor III —Scope and Variety of Operations Supervised (2 subparts)
Factor IV —Special Additional Responsibilities (4 subparts)
Total Points
Number of Grades to be Added
Final Classification

Sergeant—Assignments & Scheduling/Firearms/Storeroom/WAVES/Missions Liaison

Lieutenant—Operational, White House & Foreign Missions

Lieutenant—Canine/Special Operations/Countersniper

Lieutenant—Assignments & Scheduling/Firearms/Classroom/Storeroom/Training Administration/Magnetometer Coord/Training/Special Projects

Deficiencies in the Tracey report brought about through the use of the characterization "operational" have been discussed above. The failure to recognize the substantial differences in the work of a plaintiff assigned to the White House Branch from the work of a plaintiff assigned to the Foreign Missions Branch is an illustration of the superficiality of the Tracey report. The work papers, also, are ambiguous as to which position in a group the final classification applies. The lieutenant group that includes seven positions shows final classifications of GS–10/11/12. There is no indication as to which position a particular grade applies.[90]

The Supervisory Grade Evaluation Guide standards used to determine equivalent GS grades in the Tracey report states that one of its purposes is "to provide a basis for uniformity in distinguishing, along the continuum of supervisory-managerial responsibility, between work leaders, supervisors, and managers."

The definitions note that "supervision" and "management" are ill defined terms which have come to be applied to a continuum of responsibility, and that a distinction therefore needs to be made along that continuum between positions which have supervisory responsibility to a degree sufficient to require identification with management and those which do not. This distinction is important for determination of executive status under the FLSA. The definitions conclude:

> To highlight this difference, this standard restricts the title "Supervisory" to positions that have a sufficient level of supervisory responsibility to be considered part of the management team, as described in the following definitions of managerial and supervisory positions.[91]

Under the Guide the title "supervisory" may be applied only to positions which involve supervisory duties and responsibilities with respect to three or more employees, "whose supervisory responsibilities meet or exceed Degree B on elements 1, 2, and 3 of Factor II under Part I." Positions with some supervisory duties and responsibilities but less than that described for "Degree B" in Factor II of Part I, however, are excluded from titling as a supervisory position.[92]

Factor II of Part I is divided into four elements: (1) Work Planning and Organization; (2) Work Assignment and Review; (3) Supervisory Personnel Functions; and (4) Full and Final Technical Responsibility.[93] Degree B in elements (1), (2) and (3) is rated at 3 points.

Ms. Tracey's work papers reflect an award of 3 points for elements 1, 2 and 3 for each UD position, except element No. 2 applicable to the positions Canine/Special Operations/Countersniper was given 5 points. For element No. 1, Work Planning and Organization, Degree B supervisors carry out such responsibilities as:

> Plan work schedules and sequence of operations on a weekly, project, or longer basis to assure an even flow and distribution of work, the expeditious handling of priority cases and the meeting of schedules and deadlines;

> Revise work schedule to meet changes in workload considering factors such as peak loads, availability of manpower, and processing time requirements;

**90.** Notwithstanding these deficiencies, defendant's motion for summary judgment is based on eight of the Tracey report position descriptions.

**91.** Guide, p. 3.

**92.** Guide, p. 6.

**93.** Guide, p. 16.

Coordinate with representatives of other units concerning matters of work accomplishment, priorities and procedures;

Plan for sufficient amount of supplies;

Make recommendations concerning the maintenance or replacement of equipment and the maintenance and safety of facilities; and

Prepare workload and production reports as necessary and report on highlights of operations and problems in meeting work schedules to higher level supervisor.[94]

To obtain the information needed to establish a Degree B eligibility, the Personnel Division classifiers relied on the memories and estimates of the three senior UD officials on the study team. The record does not establish that work in some of the positions surveyed was not less than Degree B. The record does not establish that defendant has used the title "Supervisory" in accordance with the requirements of the Guide.

More important, however, is the fact that no one had done an objective review of what plaintiffs actually did during their work time. There is no showing that plaintiffs spend over 50 percent of their time doing supervisory work. It is not sufficient to show that plaintiffs perform work that could be considered exempt; defendant must also show that plaintiffs spend 50 percent of their time in such activities, or otherwise satisfy the primary duty test defined in FPM Letters Nos. 551–7 and 551–13.

Defendant contends that the record established at trial contains sufficient evidence as to the work activities of plaintiffs in the designated positions to permit the court to determine the OPM exemption criteria have been satisfied. In this defendant is in error. Throughout the trial, defendant asserted that the evidence of supervisory activity was adequate to establish compliance with OPM's and DOL's 50 percent primary duty standard, and that the equivalent GS grades removed the positions from the requirement to show compliance with the OPM 80 percent time criterion. Defendant steadfastly refused to produce evidence of the percentage of time consumed in specific work activities. Repetition of a multitude of facts asserted to show supervision is not sufficient to show a percentage of the work actually done in a work week. As the record stands, on the one hand, plaintiffs' witnesses made assertions that actual work that would identify supervisory activity was minimal or nonexistent. On the other hand, defendant's presentation of factual evidence related exclusively to work asserted to show supervision. Any estimates of time allocations that occasionally appear in the record are incidental to other examination objectives.

Defendant asserts that the new DOL regulations, 56 Fed.Reg. 45824 (Interim Rule) and 56 Fed.Reg. 45828 (Proposed Rule), provide that " . . . DOL's salary basis test does not apply to governmental employees" and that the new regulations effectively overrule prior decisions where state and local government employees were determined to be covered by FLSA simply because they did not meet DOL's salary basis test.

Defendant's interpretation does not give effect to the terms of the new regulations. The regulations provide that a public employee, who *"otherwise* meets the requirements of Section 541.118," will not be disqualified from exemption status on the basis of a pay system under which, when accrued personal leave and sick leave are exhausted, requires pay to be reduced for absences of less than one work day.

Plaintiffs are hourly employees under 29 C.F.R. § 541.118 because of a combination of factors that extend beyond a docking test. Plaintiffs work on rigid hourly schedules, receive compensatory time on an hourly basis, are subject to discipline and pay loss for AWOL, and are credited with compensatory time differently than they are credited with cash overtime.

---

94. Guide, pp. 17–18. Each of the elements has a list of responsibilities: Element (2), Guide, p. 19, Element (3), Guide, p. 21 and Element (4),

Guide, p. 24 (not used for Tracey report equivalencies).

## CONCLUSION

At this stage of this proceeding, these cases are concerned with claims for overtime pay of 111 present or former sergeants, 26 of whom also have claims for service as lieutenants, the claims of 28 lieutenants who do not have claims for service as sergeants, and the claims of 32 captains or retirees who have claims for service as sergeants or lieutenants. The UD positions involved are the positions identified above that were the subject of trial, and the positions that were identified in defendant's January 22, 1991, motion for partial summary judgment.[95]

1. Plaintiffs' entitlement to pay is established by statute at rates provided for the Metropolitan Police force. Overtime pay applicable to members of the UD is provided in D.C.Code § 4–1104. OPM regulations and DOL regulations are not basic to UD rates of pay or overtime. Nonexempt UD officers and technicians are entitled to overtime pay under both D.C.Code Title IV and FLSA, whichever pay authority provides the greater overtime entitlement in the work week. D.C. police sergeants are nonexempt under *D'Camera v. District of Columbia.* Plaintiff sergeants are similar police officers in similar positions under the D.C.Code. Accordingly, they are found to be nonexempt.

2. OPM's Title 5 exemption regulations in 5 C.F.R. §§ 551.204 and 551.205 are consistent with DOL's Title 29 exemption regulations in 29 C.F.R. §§ 541.1 and 541.2. Defendant's application of the OPM regulations, however, in the determination of equivalent GS grades did not comply with OPM criteria. The DOL primary duty test and salary basis test of the executive and administrative exemptions in 29 C.F.R. §§ 541.1 and 541.2 are applicable to the positions in these cases in the sense that OPM's regulations must be consistent with regulations promulgated by DOL.

3. Defendant has failed to meet its burden to show the duties in each plaintiff position satisfied each element of OPM's executive and administrative regulation in 5 C.F.R. §§ 551.204 and 551.205.

4. Defendant's motion for partial summary judgment is denied.

5. On or before 30 days from the date of this opinion, the parties by joint statement shall report the status of efforts to settle plaintiffs' claims. Any further proceedings relative to Stage 2 will be scheduled by separate order.

## APPENDICES

APPENDIX A: Stipulations of work performed by lieutenants and sergeants during the periods of time they occupied the positions that were the subject of trial

### 1. *Control Center Lieutenant*

The duties and responsibilities of the lieutenants assigned to the control center sections include, but are not limited to, the following activities. The lieutenants have specialized knowledge and experience in their respective UD activity. They provide advice and recommendations upon section activities for consideration by higher authorities. They oversee the activities of their sections, resolve problems which may develop in their sections, and are responsible to ensure that the activities of their sections are run properly.

They plan and coordinate the activities of their sections with other divisions and units within the Secret Service and with other outside organizations.

If problems arise which cannot be resolved by them, the lieutenants are responsible for informing high level management of these difficulties, and are expected to answer to high level management on the activities of their sections.

The lieutenants collect and evaluate information concerning the work of their sec-

---

**95.** (1) Administrative sergeant listed at p. 27 of the Tracey report; (2) research and development sergeant, Tracey report, p. 13; (3) administrative lieutenant, Tracey report, p. 13; (4) research and development lieutenant, Tracey report, p. 13; (5) assignments and scheduling office lieutenant, Tracey report, p. 10; (6) police and fire clinic lieutenant, Tracey report, p. 8; (7) vehicle maintenance lieutenant, Tracey report, p. 9; and (8) personnel recruiting lieutenant, Tracey report, p. 8.

tion for higher authority, analyze and report the information, and prepare reports or conduct briefings on their findings.

These lieutenants evaluate the work of their subordinate sergeants and prepare annual and quarterly performance evaluations of them. They also prepare supervisory potential evaluations concerning their subordinates.

The record contains, as exhibits, an Employee Performance Planning and Appraisal Form dated July 17, 1989, applicable to a specific White House Branch Control Center lieutenant, and a memorandum dated January 25, 1989, on Projects and Responsibilities White House Branch Control Center, and an operating manual for the White House Branch Control Center, filed under seal, which were filed to evidence that it has been the White House Branch Control Center lieutenant's duty and responsibility to perform such activities.

2. *Lieutenant Subordinate to the Special Agent in Charge (SAIC) Within the Office of Protective Operations UD*

The lieutenant subordinate to the SAIC advises, assists, and may represent management. The lieutenant in this position performs work of an intellectual nature which is varied and requires the exercise of judgment and considerable on-the-job training or experience.

The lieutenant collects, evaluates, and analyzes information, and prepares reports based on this information. The lieutenant briefs high level management regarding research areas undertaken, and makes recommendations on programs to be implemented, and changes in existing programs. The lieutenant may sit on selection panels.

The record contains as an exhibit an Employee Performance Planning and Appraisal Form dated July 26, 1988, applicable to a specific lieutenant subordinate to the SAIC, which was filed to evidence that it has been the duty and responsibility of said lieutenant to perform such activities.

3. *Foreign Missions Liaison/Intelligence Lieutenant*

Foreign Missions Branch liaison/intelligence lieutenant advises, assists and may represent management. The lieutenant in this position performs work of an intellectual nature which is varied and requires the exercise of judgment and considerable on-the-job training or experience.

The lieutenant collects, evaluates, and analyzes information, and prepares reports based on this information. The lieutenant briefs high level management regarding research areas undertaken, and makes recommendations on programs to be implemented, and changes in existing programs. The lieutenant may sit on selection panels.

The record contains an exhibit under seal which was prepared under the supervision of the Foreign Missions liaison/intelligence lieutenant, and submitted by him to the Deputy Chief of the Foreign Missions Branch for the Deputy Chief's approval and signature, to evidence that it has been the duty and responsibility of these lieutenants to perform such activities.

4. *Operational Lieutenant in the Foreign Missions Branch*

The duties and responsibilities of lieutenants assigned to operational positions in the Foreign Missions Branch include, but are not limited to, the following activities. They are responsible for supervising a group of UD officers and sergeants (35 to 60 persons) assigned to a specific shift or functional activity. These individuals assign tasks to, and direct the work of, their subordinates. They also prepare evaluations of the work of their subordinates. These evaluations are reviewed by their superiors. The lieutenants are responsible for preparing annual and quarterly performance evaluations concerning their subordinate sergeants. They also prepare supervisory potential evaluations concerning their subordinates.

These lieutenants may handle administrative duties for their section. They bring problems to the attention of higher level management and are involved in addressing these problems. These lieutenants may

act for the Watch Commander, and are sometimes acting Watch Commanders (overall commander of the entire section/shift).

The lieutenants assigned to operational positions in the Foreign Missions Branch attend a roll call for officials, conduct the roll call at the beginning of each shift, or ensure that the roll call is conducted properly by a subordinate. During the roll call, the officers assigned to the shift are briefed on any policy changes, relevant intelligence information, and any upcoming special events, and are given additional training regarding UD policy.

The operational lieutenants ensure any questions from the officers are answered, and do some training of their subordinates to ensure that they fully understand their duties.

The record contains as exhibits nine Supervisory Evaluation for Promotion Forms, completed in the period July 21, 1988, to August 17, 1990, applicable to specific operational lieutenants in the Foreign Missions Branch or the White House Branch, which were filed to evidence that it has been the duty and responsibility of operational lieutenants to perform such activities.

### 5. *Operational Lieutenant in the White House Branch*

The duties and responsibilities of lieutenants assigned to operational positions in the White House Branch include, but are not limited to, the following activities. They are responsible for supervising a group of UD officers and sergeants (35 to 60 persons) assigned to a specific shift or functional activity. These individuals assign tasks to, and direct the work of, their subordinates. They also prepare evaluations of the work of their subordinates. These evaluations are reviewed by their superiors. The lieutenants are responsible for preparing annual and quarterly performance evaluations concerning their subordinate sergeants. They also prepare supervisory potential evaluations concerning their subordinates.

These lieutenants may handle administrative duties for their section. They bring problems to the attention of higher level management and are involved in addressing these problems. These lieutenants may act for the Watch Commander, and are sometimes acting Watch Commanders (overall commander of the entire section/shift).

The lieutenants assigned to operational positions in the White House Branch attend a roll call for officials, conduct the roll call at the beginning of each shift, or ensure that the roll call is conducted properly by a subordinate. During the roll call, the officers assigned to the shift are briefed on any policy changes, relevant intelligence information, and any upcoming special events, and are given additional training regarding UD policy.

The operational lieutenants ensure any questions from the officers are answered, and do some training of their subordinates to ensure that they fully understand their duties.

The record contains as an exhibit, a memorandum dated September 30, 1986, which outlines routine duties and assignments of White House Branch lieutenants, which was filed to evidence that it has been the duty and responsibility of these lieutenants to perform such activities.

### 6. *Countersniper Lieutenant*

The duties of the lieutenant assigned to the countersniper unit include, but are not limited to, the following duties and responsibilities. He assigns work to, and directs the work of, approximately 39 officers and sergeants. Captain Dennis Martin, when he was the lieutenant for the countersniper unit, kept track of, and scheduled the overtime work. He also made assignments concerning manpower for the unit's advance team, and his decisions were reviewed only for budgetary considerations. The lieutenant assigned to the countersniper unit also evaluates the work of his subordinates and prepares annual and quarterly performance evaluations for his subordinate sergeants. He prepares supervisory potential evaluations concerning his subordinates. The

lieutenant also is involved in and makes recommendations to higher authority on disciplinary measures concerning members of his unit.

The lieutenant assigned to the countersniper unit participates in the selections of members of his unit. The countersniper lieutenant is and has been a member of the Management Advisory Board which evaluates and ranks highly qualified candidates which have applied for positions in the countersniper unit. The lieutenant has input regarding operation procedures and policies.

The record contains, as an exhibit a Supervisory Evaluation for Promotion Form dated July 12, 1988, applicable to a specific countersniper lieutenant, which was filed to evidence that it has been the duty and responsibility of the countersniper lieutenant to perform such activities. The record also contains Defendant's Exhibit 68, filed under seal, that lists 19 duties and responsibilities assigned to Lieutenant, Supervisor—Countersniper Unit, which the parties agree is accurate.

### 7. *Canine Lieutenant*

Policies and procedures for the use of canine teams are described in the UD Manual, APS-5. Canine teams consisting of an officer and a dog are directly responsible to the Canine lieutenant, who is the official in charge of the Canine Unit. The UD Manual names the teams as S.S. Explosive Detective Canine Teams (EDT). The manual states that EDTs are versatile in that they can perform multiple functions in addition to their explosive detection functions, i.e., scouting (looking for personnel), tracking, and general police type patrol. However, Uniformed Division canines should not be used to conduct building searches for suspects. The priority in training, when in a building, is placed on explosive detection, not personnel detection.

The duties and responsibilities assigned to the Canine unit lieutenants include, but are not limited to, the following activities. They have responsibility for supervising a group of UD officers and sergeants (28 to 40 persons) assigned to a special purpose unit or functional activity. The work supervised may be carried out on two or more shifts, as needed, and the subordinate employees may be physically dispersed at posts removed from the supervisor. As supervisors, the lieutenants assign work to, and direct the work of, their subordinates.

These lieutenants also evaluate the work of their subordinates. They prepare annual and quarterly performance evaluations for their subordinate sergeants. They also prepare supervisory potential evaluations concerning their subordinates. They are responsible for ensuring that their subordinate sergeants and officers are performing their duties properly. They may make recommendations for consideration by higher authority on appropriate disciplinary measures regarding members in their sections. The lieutenants also bring problems to the attention of higher level management and may be involved in addressing those problems.

The Canine lieutenant has been and is a member of the Management Advisory Board which evaluates highly qualified candidates which have applied for positions in the Canine Unit.

### 1. *Building Sergeant*

The duties and responsibilities of sergeants assigned to the administrative position of building sergeant include, but are not limited to, the following activities. The sergeants have specialized knowledge of the operating and administrative requirements and policies of the Uniformed Division. They may perform a variety of administrative functions, provide advice to higher officials, and assist in resolving developing administrative problems. The sergeants also research and evaluate information, and prepare, or direct the preparation of, reports concerning this information. The sergeants also are called upon to plan and coordinate functions with other divisions and sections of the Secret Service and other outside organizations.

The building sergeant is responsible to ensure that problems in the building are taken care of promptly. The building ser-

geant decides how to handle the problems that arise and whether the problems are significant enough to notify higher level management. For example, Lt. James Bialasik, when he was a building sergeant, made work assignments throughout the day as he was informed of leave status changes and developing current events affecting protection requirements.

The duties and responsibilities of Building Sergeants in the Foreign Missions Branch at the 1310 L Street location and at the substation are described in UD Manual—FMB–2. Each section has a permanently assigned building sergeant, who supervises officers working in his area. There is a substation building sergeant who coordinates work and mail runs with the 1310 L Street location.

The record contains as an exhibit a Supervisory Evaluation Form dated August 17, 1990, applicable to a specific building sergeant, which was filed to evidence that it has been the duty and responsibility of the building sergeant in the Foreign Missions Branch to perform such activities.

### 2. *Control Center Sergeant*

The duties and responsibilities of sergeants assigned to control center sections include, but are not limited to, the following activities. They assist, advise, and may represent management and serve as specialists in their respective area. Their work requires specialized knowledge, acquired through on-the-job training and experience, of the techniques, practices, and procedures associated with the activity of their section.

These sergeants resolve problems which may develop in their sections. They plan and coordinate functions with other divisions or sections of the Secret Service as well as outside organizations. The sergeants research, collect, and evaluate information and prepare reports on areas which affect their section's activities. The sergeants also represent management at meetings with officials within and outside the Secret Service (*e.g.*, with telephone

companies and the White House Communications Agency (WHCA)).

These sergeants complete annual and quarterly evaluations on their subordinate officers based on their job performance. The sergeants prepare supervisory potential evaluations concerning their subordinate officers. The sergeants may make recommendations, for consideration by higher authority, upon the discipline of subordinate officers if the situation warrants.

The record contains as exhibits two Supervisory Evaluation for Promotion Forms dated August 8, 1990, and August 13, 1990, and two Performance Planning and Appraisal Forms dated July 1, 1988, and July 5, 1989, applicable to specific control center sergeants and the White House Branch Control Center Operational/Training Manual, filed under seal. These documents were filed to evidence that it has been the control center sergeant's duty and responsibility to perform such activities.

### 3. *Intelligence Liaison Sergeant*

Intelligence Liaison sergeants are assigned to administrative positions. Their duties and responsibilities include, but are not limited to, the following activities. The sergeants have specialized knowledge of the operating and administrative requirements and policies of the UD. They may perform a variety of administrative functions, provide advice to higher officials, and assist in resolving developing administrative problems. The sergeants research and evaluate information, and prepare, or direct the preparation of, reports concerning this information. The sergeants are called upon to plan and coordinate functions with other divisions and sections of the Secret Service and other outside organizations.

The record contains as an exhibit a Memorandum dated October 30, 1986, filed under seal, prepared by the Intelligence Liaison sergeant for the Deputy Chief of the Foreign Missions Branch, to evidence the duty and responsibility of the sergeants.

The Intelligence Liaison sergeant is directly supervised by the Foreign Missions Liaison/Intelligence lieutenant, and reports

through that lieutenant to the Deputy Chief of the Foreign Missions Branch.

4. *Operational Sergeant in the Foreign Missions Branch*

The duties and responsibilities of sergeants assigned to operational positions in the Foreign Missions Branch include, but are not limited to, the following activities. These sergeants supervise approximately 7 to 20 officers who are assigned to a particular section or functional activity. As supervisors, the sergeants assist in planning, coordinating, and directing the work of their subordinate officers who perform a variety of duties related to the protective responsibilities of the Secret Service. The sergeants also assist in planning and revising work schedules, and rotate the officers around within their assigned sector, zones, or units. These sergeants are assigned sectors, zones, or units for which they are responsible. However, the sergeants may go outside of their zone or sector, and will respond to incidents, such as a demonstration, inside or outside of their sector or zone.

These sergeants are responsible for ensuring that the officers in their sector, zone, or unit are performing their duties properly and following UD policies. The sergeants take remedial action if an officer is acting improperly and recommend for consideration by higher officials formal discipline when the situation warrants. The sergeants must review the work of their officers and assess the quality of their work in order to evaluate them. The sergeants review the arrest and incident reports prepared by the officers to make sure that they are complete and accurate. The sergeants also prepare quarterly and annual formal evaluations of the work performance of their officers. The sergeants also complete promotion potential evaluations concerning subordinate officers.

These sergeants also are assigned to take charge of special details and may use their initiative to establish details in appropriate circumstances. At the scene of a demonstration, the sergeant in charge of the Emergency Response Team may make manpower deployment decisions.

These sergeants may meet with higher officials and provide, for consideration by higher officials, input regarding how to better manage the manpower and how to improve the training of the members of the UD.

5. *Operational Sergeant in the White House Branch*

The duties and responsibilities of sergeants assigned to operational positions in the White House Branch include, but are not limited to, the following activities. These sergeants supervise approximately 7 to 20 officers who are assigned to a particular section or functional activity. As supervisors, the sergeants assist in planning, coordinating, and directing the work of their subordinate officers who perform a variety of duties related to the protective responsibilities of the Secret Service. The sergeants also assist in planning and revising work schedules, and rotate the officers around within their assigned sector, zones, or units. These sergeants are assigned sectors, zones, or units for which they are responsible. However, the sergeants may go outside of their zone or sector, and will respond to incidents, such as a demonstration, inside or outside of their sector or zone.

These sergeants are responsible for ensuring that the officers in their sector, zone, or unit are performing their duties properly and following UD policies. The sergeants take remedial action if an officer is acting improperly and recommend for consideration by higher officials formal discipline when the situation warrants. The sergeants must review the work of their officers and assess the quality of their work in order to evaluate them. The sergeants review the arrest and incident reports prepared by the officers to make sure that they are complete and accurate. The sergeants also prepare quarterly and annual formal evaluations of the work performance of their officers. The sergeants also complete promotion potential evaluations concerning subordinate officers.

These sergeants also are assigned to take charge of special details and may use their initiative to establish details in appropriate circumstances. At the scene of a demonstration, the sergeant in charge of the Emergency Response Team may make manpower deployment decisions.

These sergeants may meet with higher officials and provide, for consideration by higher officials, input regarding how to better manage the manpower and how to improve the training of the members of the UD.

The record contains, as exhibits, two Supervisory Evaluation for Promotion Forms, and 12 Employee Performance Planning and Appraisal Forms applicable to specific operational sergeants in the Foreign Missions Branch or the White House Branch, which were filed to evidence that it has been the duty and responsibility of such sergeants to perform such duties.

6. *Special Operations Sergeant*

The duties and responsibilities of sergeants assigned to the special operations section, include, but are not limited to, the following activities. These sergeants supervise 13 to 18 officers assigned to a special purpose unit or functional activity. As supervisors, the sergeants assist in planning, coordinating, and directing the work of officers performing a variety of special purpose duties related to the protective mission of the Secret Service. The sergeants assist in planning and revising work schedules as required.

These sergeants review the work of officers under their command to ensure that the work is completed properly. From these observations, the sergeants complete quarterly and annual formal evaluations of the officers' work performance. The sergeants prepare supervisory potential evaluations concerning their subordinate officers. The sergeants are responsible to resolve work-related problems and take remedial action when necessary. If the situation warrants, the sergeants may recommend, for consideration by higher authori-

ties, that formal discipline be taken against an officer.

These sergeants inform employees about policies and procedures as they relate to their unit, and report employee suggestions and problems to higher level management. The sergeants may sit on task groups to develop or recommend work plans and organizational changes for consideration by higher authorities.

7. *Worker Access and Visitor Entrance System (WAVES) Sergeant*

The responsibilities and duties of sergeants assigned to the Worker Access and Visitor Entrance System (WAVES), include, but are not limited to, the following activities. They supervise approximately 4 to 12 officers assigned to this special purpose unit or functional activity. They plan, coordinate, and direct the work of officers in their sections who are performing special purpose duties related to their specific section. The sergeants also assist in planning and revising schedules.

These sergeants explain work requirements and procedures to their subordinate officers and review their work to assess the quality of the work performed. The sergeants prepare formal quarterly and annual evaluations of their subordinate officers. The sergeants prepare supervisory potential evaluations concerning their subordinate officers. The sergeants may make recommendations, for consideration by higher authority, upon other status changes of assigned personnel. The sergeants recommend to higher level management changes in the activities or procedures of their sections.

The record contains, as exhibits, Employee Performance and Planning and Evaluation Forms for periods July 1988—July 1989, and July 1989—June 1990, applicable to a specific WAVES sergeant, and a memorandum dated January 25, 1989, on projects of the WAVES Center, filed under seal, which were filed to evidence that it has been the duty and responsibility of the WAVES sergeant to perform such activities.

* * * All officers, sergeants and lieutenants in the White House Branch and the Foreign Missions Branch work under shifts established by the Assignments and Scheduling Offices, in coordination with the Control Center and the Watch Commander. The Assignments and Scheduling Offices schedule officers, sergeants and lieutenants in the White House Branch and in the Foreign Missions Branch, for all three shifts in a 24–hour period.

APPENDIX B: Stipulations of the parties of particular relevance to defendant's motion for partial summary judgment

10. With respect to all positions for which the defendant asserts that the executive exemption in 5 C.F.R. § 551.204 applies, the duties and responsibilities of persons occupying such positions involve the supervision of at least three subordinates.

11. Defendant's motion for summary judgment applies to persons during the periods of time they occupied the following positions: (1) administrative sergeant listed at p. 27 of the Tracey Study; (2) research and development sergeant, Tracey Study p. 27; (3) administrative lieutenant, Tracey Study, p. 14; (4) research and development lieutenant, Tracey Study p. 13; (5) assignments and scheduling office lieutenant, Tracey Study p. 10; (6) police and fire clinic lieutenant, Tracey Study p. 8; and (7) vehicle maintenance lieutenant, Tracey Study p. 8; and (8) personnel recruiting lieutenant, Tracey Study p. 8.

35.a. The duties and responsibilities of sergeants assigned to the administrative positions of research and development sergeant and administrative sergeant include, but are not limited to, the following activities. The sergeants have specialized knowledge of the operating and administrative requirements and policies of the UD. They may perform a variety of administrative functions, provide advice to higher officials, and assist in resolving developing administrative problems. The sergeants also research and evaluate information, and prepare, or direct the preparation of, reports concerning this information. The sergeants also are called upon to plan and coordinate functions with other divisions and sections of the Secret Service and other outside organizations.

30.a. The research and development lieutenant, and administrative lieutenant advise, assist, and may represent management. The lieutenants in these positions perform work of an intellectual nature which is varied and requires the exercise of judgment and considerable on-the-job training or experience. For example, Lt. Henry Emig, when he was the administrative lieutenant, drafted documents justifying the imposition of disciplinary measures for his superior. He also oversaw the personnel files and determined who would evaluate each employee in his section.

30.b. These lieutenants also collect, evaluate and analyze information, and prepare reports based on this information. The lieutenants also brief high level management regarding various areas in which they have undertaken research. The lieutenants make recommendations on programs to be implemented, changes in existing programs, and may sit on selection panels.

29.a. The duties and responsibilities of lieutenants assigned to the assignments and scheduling office, include, but are not limited to, the following activities. These lieutenants supervise approximately 6 to 54 officers and sergeants assigned to a special purpose unit or functional activity. The lieutenants ensure that work schedules are developed and maintained, and that appropriate work is assigned to the officers and sergeants under them. The lieutenants coordinate with representatives from other units and high-level management, and work out problems or changes. For example, Lt. Carl Kovalchik, the lieutenant in charge of the scheduling office at the White House Branch, made recommendations on scheduling, including budgetary considerations, as well as other matters. It is also the responsibility of the lieutenants to ensure that the members of their sections are informed of all policies and procedures.

29.b. These lieutenants also complete annual and quarterly performance evaluations of their subordinate sergeants based

on their day-to-day work. The lieutenants prepare supervisory potential evaluations concerning their subordinate sergeants. They also make recommendations for consideration by higher authority on reassignments or other status changes of assigned personnel, as well as discipline.

28.a. The duties and responsibilities of the lieutenants assigned to the vehicle maintenance, police and fire clinic, and personnel recruiting sections include, but are not limited to, the following activities. The lieutenants have specialized knowledge and experience in their respective UD activity (*e.g.,* lieutenants in recruiting have specialized knowledge in recruiting; lieutenants in vehicle maintenance have specialized knowledge in vehicle maintenance). The lieutenants may provide advice and recommendations upon section activities for consideration by higher authorities. They oversee the activities of their sections and are responsible to ensure that the activities of their sections are run properly. They also plan and coordinate the activities of their sections with other divisions and units within the Secret Service and with other outside organizations. For example, the logistics and control of the recruiting details were left to the discretion of Captain Alton Rhoe, the former recruiting lieutenant. The lieutenants resolve problems which may develop in their sections. If problems arise which cannot be resolved by them, the lieutenants are responsible for informing high level management of these difficulties. The lieutenants are expected to answer to high level management on the activities of their sections. These lieutenants collect and evaluate information concerning the work of their section for higher authority, analyze and report the information, and prepare reports or conduct briefings on their findings. For example, the former recruiting lieutenant, Captain Alton Rhoe, explained recruiting statistics to high level management.

28.b. These lieutenants evaluate the work of their subordinate sergeants and prepare annual and quarterly performance evaluations of them. They also prepare supervisory potential evaluations concerning their subordinates.

28.c. In addition to the previously mentioned duties, the recruiting lieutenant oversees the recruiting process for the UD. He reports problem areas in the recruiting process to his superior and makes recommendations as to how these problems should be addressed and resolved. He also makes recommendations concerning improvements to the recruiting process. The recruiting lieutenant serves as the official in charge of recruiting details, and, in that capacity, he is responsible for briefing the interviewers, matching up interviewers with applicants, and ensuring that the interviewers are fairly rating the applicants. He reviews the write-ups of the interviewers to look for continuity and trends. He has recommended, for consideration by higher authority, that some interviewers be removed from the interviewer list. The recruiting lieutenant also makes recommendations, for consideration by higher authority, upon whether an applicant should be hired.